Marshall, Ch. J.,
delivered the opinion of the court. — This is a declaration on a policy of insurance, and the only question in the case is, whether the policy was vacated by a subsequent agreement between the parties. This question depends entirely on the legal operation of certain written communications between them, which appear in the record.
Messrs. Head & Amory, of Boston, had obtained insurance, through their correspondents, Messrs. Brown & Ives, of Providence, on the cargo of the Spanish brig, the Hueva Empressa, at and from Malaga to Vera Cruz, and at and for thence to her port of discharge in Spain. An insurance was afterwards obtained on the brig, at and from Cuba (she having been chased into the Havana by British cruisers), to her port of delivery in Spain.
The vessel having been detained in port, closely watched by cruisers, until she was worm-eaten, Head & Amory became desirous of terminating ^eir risk at the Havana, *which could only be effected by permission of the government at that place, which was not to be obtained but with considerable expense. They, therefox’e, applied to the insurance company, through their correspondents, Brown & Ives, by a letter, dated Boston, the 21st August 1800, to know whether a conditional permission could be obtained froxn the underwriters, to terminate the voyage at the Havana, provided the consent of the government could be obtained; and if so, on what terms that conditional permission would be granted. The underwriters refused to make any conditional agreement, but offered to vacate both policies on terms mentioned in a letter signed by their president.
Misunderstanding the letter as a proposition for vacating the policy on the cargo only, the terms proposed were acceded to, and a letter was written from Head & Amory to Brown & Ives, declaring their acceptance of the proposition, understood to be made by the insurance company, in such a manner as very clearlyto show the mistake under which it was written. On *95 seeing this letter, the misapprehension of the parties was discovered and explained, and the agreement considered as not being made ; at the same time, a new proposition was made for settling both policies. To this letter, declining absolutely any agreement respecting either policy singly, and proposing specific terms on which they would settle both, Head & Amory returned an answer, dated the 3d of September 1800, which was addressed to Brown & Ives, and is in these words. (See ante, p. 131.) This letter was laid by Brown & Ives before the company, and their secretary returned the following note without a signature. (See the note of September 6th, 1800, ante, p. 132.) This note was forwarded by Brown & Ives to Messrs. Head & Amory, but before they received it, intelligence came to hand, that the Nueva Empressa had sailed from the Havana, and had been captured, and was condemned as a prize, late in the month of August. Head & Amory, therefore, insisted on their policy.
*Everything respecting the delays in the communications, is laid out of the case, because they do not appear to the court in any manner to affect it.
Richard Jackson, the president of another Insurance Company, was also examined, and testified, that in effecting insurance, or settling a policy, or making any adjustment or agreement about insurance, the assent of the parties to doing a thing was in all respects as binding on the parties, as the thing done, according to the usage and practice among underwriters. Upon this testimony, the court instructed the jury that the agreement to cancel the policy for the cargo was fully proved, and they ought to find for the defendants on that count. The jury accordingly found for the defendants, and the plaintiffs have sued out a writ of error to bring the cause into this court. The opinion and instructions of the judges of the circuit court to the jury are said to be erroneous, because, the communications which have been cited do not import a contract. They were negotiations preparatory to an agreement, but not an agreement itself.
The letter of the 3d of September certainly manifests some degree of disappointment, at finding that the agreement supposed to have been concluded had not really been made ; and also proves their opinion, that the negotiation was not absolutely broken off, but was yet pending. “ If we make this settlement,” say they, “we shall make every effort, by money and interest, to have the adventure terminated at the Havana, and the sooner we know the better.” “The terms we acceded to were very favorable to the company, as it was paying them at the rate of 35 per cent, for the outward premium.” Yet the letter contains no direction to make any specific proposition to the company, and may be construed either as a mere inquiry, whether the company would cancel the policy for the insurance on the cargo singly, on the terms which had before been understood to have been offered, or as a new and positive proposition, the acceptance of which would complete the contract.
*It is also very questionable, whether the unsigned note delivered by the secretary is such an acceptance as to form, when taken with the letter of the 3d of September, an absolute agreement obligatory on the company. It is a general rule, that a corporation can only act in the manner prescribed by law. When its agents do not clothe their proceedings with those solemnities which are required by the incorporating act, to enable *96 them to bind the company, the informality of the transaction, as’has been very properly urged at the bar, is itself conducive to the opinion, that such act was rather considered as manifesting the terms on which they were willing to bind the company, as negotiations preparatory to a conclusive agreement, than as a contract obligatory on both parties.
The communications stated in the record, lead to an event, which might have been so readily completed, that it might have been, and probably was, supposed unnecessary to pass through the previous solemnities of a contract binding themselves to do that which, if really the wish of both parties, might so speedily be accomplished ; so short a space of time was requisite to have the policy delivered up and cancelled, that the forms of completing a contract to cancel it, might have been deemed useless. On this account, and on account of the known incapacities of a body corporate to act or speak but in the manner prescribed by law, it may well be doubted, whether communications which, between individuals, would really constitute an agremeent, were viewed by the parties before the court in any other light, than as ascertaining the terms on which a contract might be formed.
This course of reasoning relative to the intent of the parties, is plainly founded on the idea that the note of the 6th of September is, in its legal operation, a mere informal paper, which may, perhaps, amount to notice of an act, if such act was really performed, but which is not, in itself, an act of any legal obligation on the company. That if the proposition contained in the letter of the 3d of September had been regularly accepted, note possibly have been considered as notice *of that aeceptance, but is not in itself an acceptance. If this idea be incorrect, so is the reasoning founded on it. If it be correct, then it follows, that no contract was made, because the proposition of the 3d of September, if it really was one, was not accepted by the company, before it was withdrawn by Head & Amory.
This leads us to inquire, whether the unsigned note of the 6th of September be a corporate act obligatory on the company ? Without ascribing to this body, which, in its corporate capacity, is the mere creature of the act to which it owes its existence, all the qualities and disabilities annexed by the common law to ancient institutions of this sort, it may correctly be said to be precisely what the incorporating act has made it, to derive all its powers from that act, and to be capable of exerting its faculties only in the manner which that act authorizes. To this source of its being, then, we must recur, to ascertain its powers, and to determine whether it can complete a contract, by such communications as are in this record.
The act, after incorporating the stockholders, by the name of The Providence Insurance Company, and enabling them to perform, by that name, those things which are necessary for a corporate body, proceeds to define the manner in which those things are to be performed. Their manner of acting is thus defined: “ Be it further enacted, that all policies of assurance and other instruments, made and signed by the president of the said company, or any other officer thereof, according to the ordinances, by-laws and regulations of the said company, or of their board of directors, shall be good and effectual in law, to bind and oblige the said company to the performance thereof, in manner as set forth in the constitution of the said company, hereinafter recited and ratified.”
*97 An instrument, then, to hind the company must he signed by the president, or some other officer, according to the ordinances, by-laws and regulations of the company or board of directors.
*A contract varying a policy is as much an instrument as the policy itself, and therefore, can only be executed in the manner prescribed by law. The force of the policy might indeed have been terminated by actually cancelling it, but a contract to cancel it, is as solemn an act, as a contract to make it, and to become the act of the company must be executed according to the forms in which by-law they are enabled to act. The original constitution of the company, which is engrafted into the act of incorporation, does not aid the defendants. That agreement does not appear to dispense with the solemnities which the law is supposed to require. It demands the additional circumstance that a policy should be countersigned by the secretary. It appears to the court, that an act not performed according to the requisites of the law, cannot be considered as the act of the company, in a case relating to the formation or dissolution of a policy.
If the testimony of Mr. Jackson is to be understood as stating, that an assent to the formation or dissolution of a policy, if manifested according to the forms required by law, is as binding as the actual performance of the act agreed to be done, it is probable, that the practice he alludes to is correct. But if he means to say, that this assent may be manifested by parol, the practice cannot receive the sanction of this court. It would be to dispense with the formalities required by law, for valuable purposes, and to enable these artificial bodies to act, and to contract, in a manner essentially different from that prescribed for them by the legislature.
Nor do the cases which have been cited by the gentlemen of the bar appear to the court to apply in principle to this. An individual has an original capacity to contract and bind himself, in such manner as he pleases. For the general security of society, however, from frauds and perjuries, this general power is restricted, and he is disabled from making certain contracts by parol. This disabling act has received constructions which take *out of its operation several cases not within the mischief, but which might very possibly be deemed within the strict letter of the law. He who acts by another, acts for himself : he who authorizes another to make a writing for him, makes it himself. But with these bodies which have only a legal existence, it is otherwise: the act of incorporation is to them an enabling act; it gives them all the power they possess ; it enables them to contract, and when it prescribes to them a mode of contracting, they must observe that mode, or the instrument no more creates a contract than if the body had never been incorporated.
It is, then, the opinion of this court, that the circuit court erred in directing the jury, that the communications contained in the record in this case, amounted to a contract obligatory on the parties, and therefore, the judgment must be reversed, and the cause remanded for a new trial.